**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No.  25-cr-00203-JMC** |
| **JONATHAN RAY,** | **:** | |
| | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
SUPPRESS TANGIBLE EVIDENCE**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully requests the Court deny the Defendant's Motion to Suppress

Tangible Evidence (ECF No. 27). In the early morning hours of June 26, 2025, Metropolitan Police

Department ("MPD") officers had probable cause to arrest Jonathan Ray (the "Defendant") after

they observed him commit a crime – simple assault. Specifically, officers observed, and their body

worn camera ("BWC") captured, the Defendant punch an individual during a physical altercation

that occurred outside a nightclub at two in the morning. A Metropolitan Police Department officer

and sergeant who observed the Defendant punch another individual immediately attempted to

detain the Defendant. After multiple officers struggled with the Defendant, officers eventually

handcuffed the Defendant, and then conducted a protective pat down of the Defendant. As an

officer was conducting the protective pat-down, the officer felt a hard metal object that was

inconsistent with the human anatomy, and fully consistent with a firearm, in the Defendant's

waistband. Officers then lawfully seized the firearm from the Defendant's underwear. The

officers' investigative actions were grounded in probable cause to arrest the Defendant for simple

assault and search him incident to arrest, as well as reasonable articulable suspicion that the

defendant was armed and dangerous, and were fully consistent the Fourth Amendment. Accordingly, the Court should deny the Defendant's Motion to Suppress.

## FACTUAL BACKGROUND

On June 25, 2026, at approximately 2:10 a.m., MPD officers were issuing parking tickets in the 700 block of 11th Street, NW, Washington, D.C. Based on officers' training and experience, more specifically experience in that particular section of Washington, D.C., the area is commonly known to officers for night clubs and gun violence, including firearms stolen from vehicles within the area. While issuing parking tickets, MPD officers observed several men exit the Sax Restaurant and Lounge nightclub, located at 734 11th Street, NW. Officers then observed those individuals engage in a physical altercation on the sidewalk outside the nightclub and immediately ran to intervene.



*Officer Jessica King's BWC at 2:10:43 am: Officers running to break up the fight.*

As officers ran to the group to deescalate the fight, officers observed the Defendant exit the nightclub and approach the ongoing fight. As the Defendant approached the group, he visibly pulled his pants up.



***Officer King's BWC at 2:10:44: The Defendant, circled in red, pulling at his pants as he approaches the fight.***

As Officer Jessica King ran towards the altercation, she saw the Defendant punch one of the individuals involved in the altercation. Officer King's BWC shows the Defendant, circled in red, draw his right arm back in a manner consistent with preparing to throw a punch.



3

Officer King's BWC then shows the Defendant thrust his right arm forward and appear to make contact with another person in the fight, consistent with the Defendant throwing a punch.



Officer King and another MPD officer tried to separate the individuals in the fight, which at this point involved at least four to five adult males. Officer King struggled to pull the Defendant away from the altercation and was assisted by Sergeant Michael Smith, who was running up to the altercation from behind Officer King and also saw the Defendant punch another individual. Sergeant Smith immediately attempted to detain the Defendant as the Defendant struggled with Officer King. As the Defendant struggled with both Sergeant Smith and Officer King, the Defendant stated words to the effect of "I'm trying to get my man" and "I'm not doing nothing." Sergeant Smith responded, "I saw you punch him." Sergeant Smith BWC at 02:10:49. The Defendant continued to struggle with Officer King and Sergeant Smith as they attempted to detain him.



***Sergeant Smith's BWC at 2:11:02 am: The Defendant is pulling away from both
Officer King's and Sergeant Smith's attempts to detain him.***

Sergeant Smith repeatedly commanded the Defendant to "turn around," however, the Defendant did not comply. *Id*. at 02:11:02. Instead, the Defendant kept repeating, "I'm not punching no body" and, with the help of another individual on scene, pulled his arm out of Sergeant Smith's and Officer King's grasp and immediately walked away from the scene and the officers. Officer King attempted to detain a different individual who was interfering with the stop of the Defendant, while Sergeant Smith followed the Defendant, with handcuffs out and at the ready, and again attempted to detain the Defendant. At that point, the Defendant pushed Sergeant Smith off of him and away from him, claiming "I'm leaving, man. I'm leaving." *Id*. at 02:11:11 – 02:11:18.

The Defendant and two apparent associates then attempted to walk away, despite Sergeant Smith's commands, "No, He's not leaving." King BWC at 02:11:37. Additional officers responded to assist Officer King and Sergeant Smith as they attempted to detain the Defendant and separate

the others that were trying to assist the Defendant in leaving. Officer Blagrove walked up to where Officer King and Sergeant Smith were struggling with the Defendant, and was finally was able to place the Defendant in handcuffs. Blagrove BWC at 02:12:08.

Once Officer Blagrove arrived, Officer King walked over to where an officer had a second individual detained, checked to make sure that officer was okay, and then walked back to give commands to several adult females, who had been approaching where the Defendant was located, to "back up." King BWC at 02:12:08. One woman asked Officer King why they were locking him up as the woman pointed towards the Defendant. Officer King advised the woman that "they were fighting out here." *Id*. at 02:12:28. The woman, who did not appear to have been present at the time of the physical altercation, then claimed that "he" (while pointing at the Defendant) was "trying to break it up." Officer King responded, "It didn't matter, we watched him throw a punch." *Id*. at 02:12:28. Officer King continued to advise the woman, "you didn't see what we saw, you weren't out here" and again attempted to diffuse the situation by asking the women to back up from where the Defendant was detained. *Id*. at 02:12:34.

While Officer King and other officers attempted to control the scene a few feet away from Officer Blagrove, Officer Blagrove continued to detain the Defendant. As Officer Blagrove was adjusting the handcuffs on the Defendant, the Defendant continued to yell at Sergeant Smith. The Defendant stated that he was "chilling," and then alternately stated that he was trying to leave and that he was trying to break "it" up. Smith BWC at 02:13:12. Sergeant Smith then asked whether the defendant if he punched "him," to which the defendant responded words to the effect of, "No, I did push him, I didn't punch him." *Id*. at 02:13:09.

Once Officer Blagrove had the Defendant's handcuffs secured and Officer King and other officers had escorted other individuals away from where the Defendant was detained, Officer

Blagrove began to conduct a protective pat-down of the Defendant. Blagrove BWC at 02:14:25.

As he began the pat-down, Officer Blagrove asked the defendant if he "had any firearms on him."



***Officer Blagrove's BWC at 2:14:28 am: Officer Blagrove conducts a pat-down of the Defendant.***

 Officer Blagrove then observed the Defendant, despite being in handcuffs, attempting to reach into his pants multiple times. Officer Blagrove asked for another officer to come over to assist him, then continued his pat-down of the Defendant. As Officer Blagrove conducted the pat-down, he felt an object in the Defendant's front left pocket. Upon feeling that object, Officer Blagrove recognized that it could contain pills. Officer Blagrove removed the plastic baggie which contained 147 oxycodone pills in a clear plastic bag.



***Officer Blagrove's BWC at 02:16:05 am: Officer Blagrove removes a bag containing 147 oxycodone pills from the Defendant's front left pant pocket.***

After recovering the pills, Officer Blagrove resumed his pat-down of the defendant, and felt a hard metal object in the Defendant's underwear that was not consistent with the human body. Meanwhile, individuals in the crowd outside the nightclub began to get closer to the Defendant and officers. A woman then attempted to enter the driver's seat of the red car, immediately next to where Officer Blagrove was searching the Defendant. Officer Blagrove then yelled to his colleagues, "Get everyone back, we got something." Blagrove BWC at 02:17:20. Officer Blagrove directed the Defendant, who had his hands on waist, to "move his hands," and then held the Defendant's hands against his back. Blagrove BWC at 02:17:22. Officer Blagrove repeated his commands to "back them up, we got something," then called out to another officer, saying, "Hey, I need you." Blagrove BWC at 02:17:39. Officer Blagrove told another officer to "hold him," and then stated, "he's strapped." Blagrove BWC at 02:18:09. Officer Blagrove then retrieved the firearm, a Glock 29 Gen 4, 10mm caliber pistol, with fifteen rounds in the magazine and one round in the chamber, from the Defendant's underwear.

8



***Officer Blagrove's BWC at 2:18:35 am: Officer Blagrove holding the recovered firearm.***

Officers conducted a check of the DC Gun Registry Database, which revealed that the Defendant was not licensed to possess a firearm in the District of Columbia. A criminal history check revealed that the Defendant had prior felony convictions as well. The Defendant was placed under arrest and on June 26, 2025, he was charged in D.C. Superior Court with Unlawful Possession of a Firearm (Prior Conviction) and Carrying a Pistol Without a License. On July 8, 2025, the defendant was charged by complaint with one count of violating 18 U.S.C. 922(g)(1) in the instant case. (ECF No. 1).

## ARGUMENT

The Defendant moves to suppress the tangible evidence in this case, namely the firearm that was recovered from his underwear, because he contends that officers lacked reasonable suspicion to stop him. (ECF No. 27). The Defendant's arguments are unsupported by facts of this

9

case or the law and must fail. Officers had more than reasonable articulable suspicion to conduct an investigative stop of the Defendant; they had probable cause to believe that the defendant committed a crime, namely, a simple assault in violation of D.C. Code 22-404(a)(1) that occurred when officers saw the defendant punch someone in a physical altercation. Once the officers had probable cause to arrest the Defendant, they were permitted to make a full search of his person incident to his arrest. *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Holmes*, 385 F.3d 786 (D.C. Cir. 2004); *Wesley v. United States*, 293 F.3d 541 (D.C. Cir. 2002). During this lawful search of the Defendant's person, Officer Blagrove recovered the firearm, and then had probable cause to arrest the defendant for firearms charges.

Even if, *arguendo*, officers had not possessed probable cause to arrest the Defendant for simple assault, they had, *at a minimum*, reasonable articulable suspicion that the Defendant was engaged in criminal activity (the fight), and further reasonable articulable suspicion that the Defendant posed a safety risk which justified a protective frisk. Thus, the officers' detention of the Defendant and seizure of evidence, including the firearm, was lawful pursuant to the Fourth Amendment and should not be suppressed.

### A. Officers had probable cause to arrest the Defendant and search him incident to arrest.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Fourth Amendment generally permits police to make warrantless arrests upon probable cause for felony offenses. *See United States v. Watson*, 423 U.S. 411 (1976); see also D.C. Code § 23-581 (authorizing warrantless arrests in felony matters). The test for probable cause is not reducible to "precise definition or quantification[,]" *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), but requires a "fair probability"

on which "reasonable and prudent [people,] not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 238, 231 (1983) (internal quotation marks omitted). As with the reasonable articulable suspicion analysis, the court should assess the "totality of the circumstances" when reviewing whether law enforcement had probable cause. *Pringle*, 540 U.S. at 371. "While each fact standing alone may be insufficient, the combination of all of the facts can establish probable cause . . . and certain conduct that may appear innocent to a lay person may have entirely different significance to an experienced law enforcement officer." *United States v. Gilliam*, 167 F.3d 628, 633 (D.C. Cir. 1999) (internal citations and punctuation omitted). "In assessing probable cause, as the Supreme Court has declared, 'the evidence . . . collected must be seen and weighed not in terms of analysis by scholars, but as understood by those versed in the field of law enforcement.'" *United States v. Laws*, 808 F.2d 92, 103 (D.C. Cir. 1986) (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983) (quoting in turn *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

In this case, law enforcement clearly had probable cause to arrest the Defendant for simple assault when two separate law enforcement officers saw the Defendant punch another individual during a physical altercation. Their observations were based on a clear line of sight of the Defendant, who punched the individual while standing under bright lights, and were corroborated by BWC footage showing the footage, and the officers' contemporaneous statements about how they saw the Defendant punch another person. Further, when officers attempted to detain those involved in the fight, the Defendant refused lawful commands, insisted he did not do anything, and tried multiple times to leave the area. When the Defendant was finally detained, he himself admitted that he pushed another person in the altercation, though his admissions came in the form of a self-serving claim that he was trying to "get his man" – an apparent appeal that he was acting in defense of himself or others. This claim was clearly undercut, however, by the officers' own

11

observations corroborated by their BWC, showing the Defendant joining in the fight after MPD had already intervened, and joining in a matter in which he was antagonizing and assaulting another, rather than trying to pull someone out of the fight.

Because officers had probable cause to arrest the Defendant for simple assault in violation of D.C. Code 22-404(a)(1), they were permitted to search his person incident to arrest. A search incident to arrest is a well-established exception to the Fourth Amendment's warrant's requirement and permits officers to search an arrestee's person and the area within his immediate control. *See Chimel* 395 U.S. at 763 ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape … In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."). Officers had probable cause to arrest the Defendant for assault and were thus authorized to conduct a contemporaneous search of his person which led to the recovering the firearm from the Defendant's underwear. "'The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control.'" *Id.* at 764 (citing *Preston v. United States*, 376 U.S. 364, 367 (1964)). Because the arrest was supported by probable cause that the Defendant committed a crime—the simple assault—and the search was conducted incident to that lawful arrest, the firearm was thus lawfully recovered.

Moreover, the Defendant's reliance on the Second Amendment is misplaced as the firearm

was not recovered out of mere suspicion that he was armed.[1] Rather, officers developed probable cause to arrest the Defendant following an assault and Defendant's attempts to walk away from officers and resisting their attempts to detain him. Officers were authorized to conduct a search incident to arrest without first running a records check establishing the Defendant's status as a prohibited person. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."). Accordingly, the Defendant's Second Amendment argument provides no basis for suppression.

**B. Officers had reasonable articulable suspicion to detain the Defendant under *Terry*.**

Even if the Court were to find that officers' firsthand observation of the Defendant punching another individual did not amount to probable cause, their observations clearly provided them with reasonable suspicion to conduct an investigatory stop of the Defendant to investigate his involvement in the fight. The Fourth Amendment requires that "all seizures, even one involving 'only a brief detention short of traditional arrest,' be founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). "[A]n officer may briefly detain a citizen if he has

---

[1] The cases the Defendant cites to in support of this proposition are also inapposite to the instant case. For example, the Defendant cites to *Duffie v. City of Lincoln*, an Eight Circuit qualified immunity case, for the concept that a "mere report of a person with a handgun is insufficient to create reasonable suspicion." 834 F.3d 877, 883 (8th Cir. 2016). But the Eight Circuit did not create any bright line rule with respect to reports of a person with a handgun; instead, the Eight Circuit held that officers did not have reasonable articulable suspicion to conduct a high risk traffic stop and detain the appellant, a bald 58-year black man who was a double amputee, in response to a report from three hours earlier in the evening of a young black man in a tank top with braids who had a gun with him while he was at a convenience store. *Id*. at 883-884. In reaching its holding, the Eight Circuit focused on the fact that in Nebraska, the jurisdiction from which the case arose, the law permits 18-year-olds to open carry handguns in public, and that the report did not allege that the suspect had committed an assault. Accordingly, the court analogized the report to information from an informant that is lacking any indicia of reliability, or to a bare bones tip that doesn't satisfy the Fourth Amendment. *Id*.

reasonable, articulable suspicion that criminal activity may be afoot.'" *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119 (2000). As with probable cause, courts look to the totality of the circumstances. *See Edmonds*, 240 F.3d at 59 ("An officer on the beat does not encounter discrete, hermetically sealed facts. Rather, as we repeatedly have cautioned, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them."). Finally, as with the probable cause standard, even acts that, viewed in isolation, are innocent can, in combination, warrant further investigation and amount to articulable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 274-275 (2002). In addition to being able to briefly detain an individual in order to investigate whether a crime has occurred, *United States v. Sharpe*, 470 U.S. 675, 682, (1985), an officer may conduct a protective pat-down of a defendant "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry,* 392 U.S. at 27.

The reasonable suspicion standard is not particularly rigorous. "[T]hat level of suspicion is considerably less than proof of wronging by a preponderance of the evidence … the level of suspicion required for a *Terry* stop is obviously less demanding than that of probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 544 (1985)). In order for an investigatory stop to be proper it "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417. The fact that officers personally observed the Defendant engage

14

in a fight is such "objective manifestation." *See United States v. Mitchell*, No. 23-CR-176, 2024 WL 68254, at *5 (Jan. 5, 2024) ("Police may briefly detain a person where an officer has a 'reasonable suspicion' that the person is about to engage or engaging in criminal activity.") (citing *Edmonds*, 240 F.3d at 59). Officers were directly in the vicinity issuing parking tickets when the fight initially broke out. As discussed above, the officers' observations were firsthand and were corroborated by body-worn camera footage. Further, when officers attempted to detain those involved in the fight, the Defendant refused lawful commands and insisted he did not do anything. Rather, he broke free from Officer King and Sergeant Smith's grasp and attempted to leave the area. Rather than comply with the officers' lawful investigatory detention, the Defendant actively frustrated their efforts by pulling away and leaving the area. When Sergeant Smith again attempted to detain the Defendant, he again physically resisted and thwarted Sergeant Smith's efforts. Eventually Officer Blagrove was able to secure the Defendant in handcuffs, but even then, the defendant continued to reach to his waistband at times. The Defendant's repeated efforts to evade and physically resist detention, after officers observed him seek out and join a fight, reasonably heightened officer safety concerns and further justified both the investigative detention

The Defendant nevertheless attempts to dissect the encounter into isolated events rather than consider the totality of the circumstances as required by the Fourth Amendment jurisprudence. As the Supreme Court recently reminded, however, the totality of the circumstances test "precludes this sort of divide and conquer analysis." *District of Columbia v. R.W.*, 608 U.S. ___ (2026) (per curiam) (citing *Arvizu*, 534 U. S., at 274).[2] Quoting *District of Columbia v. Wesby*,

---

[2] The Supreme Court in D.C. v. R.W. found that the D.C. Court of Appeals failed to consider the totality of circumstances that gave rise to an officer having reasonable suspicion to conduct an investigatory stop on a suspicious vehicle by excising the radio dispatch of the defendant and only considering the lateness of the hour and the slight car movement. *Id*.

15

583 U.S. 48, 60-61 (2018), the Court reiterated, "the whole is often greater than the sum of its parts – especially when the parts are viewed in isolation.'" *Id*. The Defendant focuses on individual events such as witnesses statements and that the Defendant walked away. However, that piecemeal approach misses the mark. Just as in *D.C. v. R.W.*, it is prudent to view the facts as a whole rather than "piecemeal and without context." *Id*. Here the encounter was precipitated by the officers' own observations of the Defendant exiting the nightclub and hitting someone, which prompted their intervention. Moreover, as evidenced by Officer King's statements as captured on her BWC, those that were claiming that the Defendant was not involved or was trying to break up the fight were not physically present at the time of the physical altercation.

Additionally, the Defendant attempts to claim he was "lawfully" trying to break up the fight and there was no complaining witness who was punched. The Defendant's arguments are unavailing. Whether no individual victim wished to pursue charges, or whether other witnesses offer conflicting versions of events, does not undermine the objective reasonableness of the officers' actions and whether they observed a crime being committed. The officers were not required to disregard what they personally observed simply because the Defendant's associates supported his self-serving explanation for his actions. Moreover, in this particular case, the Defendant's reliance on self-defense does not undermine the officers' lawful actions because a self-defense claim depends on fact-intensive determinations such as who was the initial aggressor,[3]

---

[3] *U.S. v. Peterson*, 483 F.2d 1222, 1231 (D.C. Cir. 1973) (reaffirming principle that self-defense is available as defense to aggressor only if he communicates to his adversary his intent to withdraw and makes a good faith attempt to do so); *Rowe v. U.S.*, 370 F.2d 240, 241 (D.C. Cir. 1966) ("Self-defense may not be claimed by one who deliberately places himself in a position where he has reason to believe his presence would provoke trouble."); *Harris v. U.S.*, 364 F.2d 701 (D.C. Cir. 1966) ("One cannot provoke fight and then rely on claim of self-defense when such provocation results in counterattack unless he has previously withdrawn from fray and communicated such withdrawal.")

a subjective and objective determination as to whether the defendant actually and reasonably believed force was necessary to protect himself or another from imminent bodily harm,[4] or whether a reasonable amount of force was used.[5] This cannot be resolved instantaneously to the officers responding to an ongoing altercation. *See generally Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014) ("'Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and explore and eliminate every theoretically plausible claim of innocence before making an arrest'") (citing *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997); *see also Wesby*, 583 U.S. at (officers need not adopt a "divide and concur approach" or rule out any innocent explanations before acting).

 *Amobi* and *Wesby* arise out of the context of probable cause, and their principals apply equally to this case when considering whether the officers had probable cause to arrest the Defendant based upon seeing him punch another individual, or whether officers had the less demanding reasonable articulable suspicion to detain the defendant as they investigated the fight. Here, officers were dealing with a "rapidly unfolding situation" and acted by detaining the Defendant to investigate and for safety concerns. *See Terry*, 392 U.S. at 10 (recognizing that officers are "dealing with rapidly unfolding and often dangerous situations on city streets" and are "in need of an escalating set of flexible responses."). Confronted with active altercation in the early morning hours outside of a nightclub, where officers personally observed the Defendant throwing a punch, and the Defendant's associates were actively interfering with officers attempts to detain the Defendant, the totality of the circumstances justified officers' detention of the Defendant before they dispelled every competing accounts of the Defendant's self-defense assertions.

---

[4] *See, e.g.*, Criminal Jury Instructions for DC Instruction 9.500.
[5] *See, e.g.*, Criminal Jury Instructions for DC Instruction 9.501.

**C. Officer Blagrove had reasonable suspicion that the Defendant posed a safety risk which justified the protective pat-down.**

After the Defendant was finally secured in handcuffs, following his repeated resistance, officers conducted a limited protective frisk for weapons. Given the totality of the circumstances including the Defendant's involvement in the fight, his repeated resistance towards officers, his attempt to walk away from detention, and the overall inherently volatile nature of the encounter, officers had an objectively reasonable belief that the Defendant could be armed and dangerous. In the course of a lawful stop, a police officer may conduct a search for weapons for his protection where "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27. The purpose of such a *Terry* frisk is "to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams,* 407 U.S. 143, 146 (1972). Probable cause is not required in this context. Rather, the officer conducting the frisk only must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *(Wilson) Mitchell,* 951 F.2d at 1296 (quoting *Terry,* 392 U.S. at 21).

Moreover, officers knew, based on their years of experience, that they were in an area commonly known for nightclubs and gun violence. S*ee Edmonds*, 240 F.3d at 60. ("As for the first factor, the probative value of a neighborhood's reputation as a high-crime area is firmly established. Of course, the fact that a given locale is well known for criminal activity will not *by itself* justify a *Terry* stop; but it is among the various factors that officers may take into account.") (citing *Wardlow*, 528 U.S. 119); *see also United States v. Gorham*, 317 F. Supp. 3d 459, 464 (D.D.C. 2018) (The "type and intensity of past crime in the area may similarly point to the reasonableness of an officer's belief that a crime has been or is being committed.") (cleaned up).

During the pat-down, Officer Blagrove felt a hard metal object inconsistent with the human

18

body. Additionally, Officer Blagrove observed the Defendant, despite being in handcuffs, attempting to reach into his pants. "[T]his Court recognizes that 'furtive' gestures in response to the presence of the police can serve as the basis of an officer's reasonable suspicion." *Edmonds*, 240 F.3d at 61; *See also Wardlow,* 528 U.S. at 124 (recognizing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Green,* 465 F.2d 620, 623 (D.C. Cir. 1972) (officers justified in conducting *Terry* stop when they stopped car for traffic violation and observed driver making "furtive movements as though pulling something out of his belt and placing it under his seat"); *United States v. Moorefield,* 111 F.3d 10, 14 (3d Cir. 1997) (defendant's raising and lowering hands inside car despite instruction to keep hands in the air constituted suspicious behavior and justified protective frisk).

Officer Blagrove had a well-grounded reasonable suspicion that the object could be a weapon. "'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry* 392 U.S. at 24). Officer Blagrove's concern that the Defendant may be armed was certainly, under the circumstances, reasonable, as was his response to the Defendant's conduct. The decision to frisk the Defendant thus fell well within the scope of reasonable conduct necessary to "neutralize the threat of physical harm." *United States v. Clark,* 24 F.3d 299, 304 (D.C. Cir. 1994) (quoting *Terry,* 392 U.S. at 24).

Finally, having detected the presence of an unknown, potentially dangerous object during the frisk, the question then becomes whether a reasonably prudent person in these circumstances would have been warranted in the belief that his safety, or that of others, was at risk. *See United*

19

*States v. Holmes*, 385 F.3d 786 (D.C. Cir. 2004) (holding that "a police officer acted reasonably in taking out hard, square object he felt in defendant's parka pocket while performing pat-down search of defendant under *Terry* during traffic stop"). In *Holmes*, the D.C. Court of Appeals held that although the officer did not believe the object was a firearm in the defendant's pocket, he was justified in removing the object, a scale, based on the totality of the circumstances. *Id*. at 790 (citing *United States v. Swann*, 149 F.3d 271, 272 (4th Cir.1998) ("Although the searching officer did not testify that he believed the item in Swann's sock to be a weapon when he removed it, a reasonable officer in his circumstances could well have believed that the item was a weapon ... and therefore the seizure did not exceed the permissible bounds of a *Terry* stop."). Here, the Defendant repeatedly ignored officers' commands, resisted arrest, struggled with officers, and was attempting to reach into his pants. A reasonable police officer in these circumstances would be warranted to seize the firearm.

## CONCLUSION

Based on the totality of the circumstances, officers had probable cause to arrest the Defendant for simple assault after they personally observed the Defendant punch someone in a physical altercation outside of a night club. Once they had probable cause to arrest the defendant, they were permitted to conduct a search incident to arrest of the Defendant and seize the firearm on his person. Moreover, even if officers did not have probable cause to arrest the defendant, they had reasonable articulable suspicion that the Defendant was involved in a crime (the fight) and was armed and dangerous. Not only did the officers personally observe the Defendant engage in a physical alteration during the early morning hours outside a nightclub, the Defendant actively resisted and fought against their efforts to detain him and further heightening the officers' safety concerns. Accordingly, in addition to having a lawful basis to search the Defendant's person

incident to his arrest, officers had reasonable articulable suspicion to detain the Defendant and conduct a protective pat down of the Defendant. Under either standard, the officers' seizure of the defendant, protective pat-down, and subsequent seizure of the firearm on his person was lawful under the Fourth Amendment. Accordingly, the Defendant's motion to suppress should be denied.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By:   /s/ *Lauren Ibanez*
LAUREN IBANEZ
Assistant United States Attorney
NJ Bar No. 261642019
601 D Street, N.W. Washington, D.C. 20530
(202) 252-7566
Lauren.Ibanez@usdoj.gov