**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JONATHAN RAY,<br><br>    Defendant. | Case No. 25-cr-203 (JMC) |

**MEMORANDUM OPINION & ORDER**

Defendant Jonathan Ray moves to suppress the Government's use of tangible evidence at his upcoming trial on a charge of violating 18 U.S.C. § 922(g)(1) by unlawfully possessing a firearm and ammunition after having previously been convicted of a crime punishable by imprisonment for a term exceeding one year. ECF 27. The evidence in question is a firearm and a bag of pills found after a search of Mr. Ray's person by Washington D.C. Metropolitan Police Department (MPD) officers on June 26, 2025, after breaking up an altercation outside of a nightclub. For the reasons discussed below, the Court **DENIES** the motion to suppress.[1]

## I.    Factual Background

On July 13–14, 2026, the Court held an evidentiary hearing on Ray's suppression motion. *See* July 13 and July 14, 2026 Min. Entries. The Court heard testimony from MPD Sergeant Michael Smith, one of the officers who initially seized Ray, and then-Officer (now Sergeant) Othneil Blagrove, who searched Ray and found a firearm in Ray's waistband. *See generally* Rough

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion and order, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

Draft Tr. of Hr'g on Mot. to Suppress (July 13, 2026) [hereinafter July 13 Hr'g Tr.]. Both witnesses authenticated their own body worn camera footage, and Smith also authenticated the body worn camera footage of Officer Jessica King, which also captured the incident. *See id.* at 14:21–15:7, 24:14–28:9, 98:19–99:8; Rough Draft Tr. of Hr'g on Mot. to Suppress (July 14, 2026) [hereinafter July 14 Hr'g Tr.] at 6:14–7:7; *see also* Gov't Ex. 1 (Smith BWC); Gov't Ex. 2 (King BWC); Gov't Ex. 3 (Blagrove BWC); Def. Ex. 1 (additional Blagrove BWC). Based on the testimony presented and what can be seen and heard on the body worn camera footage, the Court finds as follows:

In the early hours of June 26, 2025, a group of MPD officers, which included Smith, King, and Blagrove, were stationed at various points on the 700 block of 11th Street Northwest, Washington, D.C., near the SAX Restaurant & Lounge nightclub. *See, e.g.*, July 13 Hr'g Tr. at 6:18–8:11. Around 2:00 AM, Sergeant Smith was standing down the block from the nightclub when he heard screaming and yelling, and turned and saw a "group" and "individual getting into it." *Id.* at 9:7–10. Indeed, Officer King's camera footage demonstrates that a tussle between at least two individuals was taking place just off the sidewalk, in the bike lane. King BWC at 2:10:43.[2] Smith began running towards the group, and as he did, he saw Ray, who was not initially part of the altercation, walk towards the group and throw a punch into the scrum. July 13 Hr'g Tr. at 10:1–4; *see also* Smith BWC at 2:10:43–47 (demonstrating Smith's sight line down the bike lane towards the altercation); King BWC at 2:10:43–47 (simultaneous video presenting a closer view of Ray's approach to the group and throwing what appears to be a punch into the group). Although it is not entirely clear from the body camera footage who the punch hit, Smith testified that he saw Ray's punch make contact with one of the men in the group. July 13 Hr'g Tr. at 31:15–18.

---

[2] The timestamps referred to in the body worn camera exhibits are the timestamps printed on the upper right corner of the videos, which are generally consistent across each video, rather than the playback timestamp of each specific video clip, which vary in duration across the various exhibits.

Smith and King restrained Ray by grabbing him by the arms, and Smith said, "I saw you punch him," which Ray denied. Smith BWC at 2:10:48–11:03. Ray then pulled away from the officers and began walking down the street with two other individuals, despite the officers' orders for him to stop. Smith BWC at 2:11:03–23; King BWC at 2:11:03–23. Although Ray and the others told King and Smith that Ray didn't punch anyone and was "leaving," Smith repeatedly told Ray that "he's not leaving," while blocking his path. Smith BWC at 2:11:37–57. Along with Officer King, Smith again restrained Ray by grabbing him by the arms. *Id.* Smith then locked a handcuff over Ray's left wrist and told Ray that he was "resisting." *Id.* at 2:11:54–12:00. At this point, Officer Blagrove, who was further down the street when the incident began, joined King and Smith, and simultaneously locked handcuffs onto Ray's right wrist. Blagrove BWC at 2:11:54–12:00. While Blagrove locked the two pairs of handcuffs together to restrain Ray, Smith stepped away and radioed to dispatch, saying, "we have a fight here down at 11th Street," and asked dispatch to send a "wagon." Smith BWC at 2:12:12–18. Smith testified that his request for a "wagon" was for a vehicle to transport Ray to a police station, because at that point, he considered Ray to be under arrest. July 13 Hr'g Tr. at 19:20–23. He walked back over to Ray, who continued to deny that he was fighting anyone, and Smith said, "you didn't punch him?" Smith BWC at 2:13:06–12. Ray responded: "I pushed him." *Id.* While Blagrove continued to hold Ray and adjust the handcuffs, a bystander asked the officers if "you're locking them all up," to which Smith replied, "all of them going." *Id.* at 2:13:37–40; Blagrove BWC at 2:13:37–40.

By around 2:14 AM, an MPD van—the transport "wagon" previously referred to by Smith—arrived on the scene and parked next to where Blagrove was standing with Ray. Smith BWC at 2:14:15–22 (showing the van's arrival and Smith's request to "open the wagon"). Blagrove proceeded to feel Ray's pockets, waist, and torso, and asked Ray if he had "any weapons

on" him. Blagrove BWC at 2:14:28–31. Smith, at that point standing several feet away from Blagrove and Ray, explained to another officer that "they're fighting, we're all standing here, they're all fighting." Smith BWC at 2:14:35–38; Blagrove BWC at 2:14:35–38. Smith also described the incident to the other officer as an "affray." Smith BWC at 2:14:42–44. Then after handing an evidence bag to another officer, Blagrove proceeded to conduct a search of Ray's person, feeling inside his pockets, his waistband, and the outside of his pants. Blagrove BWC at 2:14:52–17:17. During the search, Blagrove found a bag of pills. July 13 Hr'g Tr. at 102:19–22; Blagrove BWC at 2:16:01–05. He also found a firearm in Ray's underwear, which Blagrove placed in an evidence bag. July 13 Hr'g Tr. at 97:14–16; Blagrove BWC at 2:17:17–18:36. Ray was subsequently charged under 18 U.S.C. § 922(g)(1) for unlawful possession of a firearm and ammunition after having previously been convicted of a crime punishable by imprisonment for a term exceeding one year.

## II.    Legal Standard and Analysis

Ray challenges the search which discovered the firearm and pills as illegal under the Fourth Amendment. An arrest supported by an officer's "probable cause to believe that a crime has been committed," does not run afoul of the Fourth Amendment. *United States v. Bookhardt*, 277 F.3d 558, 564 (D.C. Cir. 2002); *see also, e.g.*, *Beck v. Ohio*, 379 U.S. 89, 91 (1964). And having lawfully placed an individual under arrest, officers may search the individual's person pursuant to the "well-established 'search incident to arrest' exception to the Fourth Amendment's warrant requirement." *Bookhardt*, 277 F.3d 558 at 564 (citing *New York v. Belton*, 453 U.S. 454, 460 (1981)). As with much of the Fourth Amendment analysis, "the propriety of a search under the Fourth Amendment depends on 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's own subjective intent in executing the

search." *United States v. Holmes*, 385 F.3d 786, 790 (D.C. Cir. 2004) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)). "The only relevant question is whether a reasonable officer, knowing what [that officer] knew at the moment of seizure, would have been justified in" making the search. *Id.*

The record demonstrates that Smith had sufficient probable cause to support a warrantless arrest of Ray. An officer has probable cause to arrest, if, at the moment of the seizure, "the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the defendant] had committed or was committing an offense." *Beck*, 379 U.S. at 91. To begin, Smith had probable cause to arrest Ray for simple assault. Under District of Columbia law, it is a crime to "unlawfully assault[]" another person. *Perez Hernandez v. United States*, 286 A.3d 990, 995 (D.C. 2022). This crime, known as "simple assault," prohibits "common law assault," and extends to "nonviolent offensive touching," such as a battery. *Id.* at 996, 998–99. The intent requirement for such a crime is satisfied if the offensive touching is done "for the purpose of offending" the victim or if the person knows that the touching will cause offense. *Id.* at 1002.

Smith testified that he had a view of the fight outside of the nightclub, and that he saw Ray, who was not initially involved in the fight, approach the group and throw a punch at one of the men in the group. July 13 Hr'g Tr. at 31:15–18. This account is corroborated by both his and King's body worn camera footage. *See* Smith BWC at 2:10:43–47; King BWC at 2:10:43–47. On King's footage in particular, which captured a similar angle to Smith's viewpoint albeit at a closer distance, the Court clearly observes Ray walk over to the people who were tussling, draw back his arm and throw what appears to be a punch. *See* King BWC at 2:10:43–47. Having seen Ray taking a swing at the other individuals in the group, Smith had probable cause to arrest him for assault.

*See, e.g.*, *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168, 202 (D.D.C. 2025) ("[I]t should go without saying that an officer who reasonably believes that a person has slapped him would have probable cause to arrest that person for assault."). Smith also had probable cause to arrest for the crime of "affray," D.C. Code. § 22-1301, which "occur[s] whenever two persons fight in public," *Hedgpeth v. Rahim*, 213 F. Supp. 3d 211, 223 (D.D.C. 2016), *aff'd on other grounds*, 893 F.3d 802 (D.C. Cir. 2018).

Ray disputes this conclusion. He makes much of the fact that Smith, while testifying, had difficulty identifying the specific individual that Ray punched on the body camera footage, despite claiming to have seen him land a punch on one of the men in the group. July 13 Hr'g Tr. at 46:14–48:6. Ray also notes that the Government has not subsequently identified any individual who complained that Ray punched him, and further claims that there can be no probable cause to arrest someone for simple assault without an identifiable victim. ECF 27 at 5. True, King's body worn camera footage, which provides the clearest view of Ray's approach to the scrum and his punching motion into the group, does not entirely resolve the issue of which individual was hit. *See* King BWC at 2:10:43–47. But the evidence in total, including the body camera footage and the fact that both Smith and King, although acting separately, both acted immediately to restrain Ray, supports Smith's claim that he saw Ray hit one of the individuals in the group in a seemingly offensive manner. Further, Smith's statements to Ray on the scene—before he had the opportunity to review his camera footage—make clear that he saw Ray hit someone. Smith BWC at 2:10:52–53 (saying, immediately after the police broke up the scrum, and when initially grabbing Ray, that "I saw you punch him"); *see also id.* at 2:13:06–12 (asking Ray in response to his denials, "you didn't punch him?"). And Ray himself appeared to admit that he made offensive contact with a specific person, when he subsequently stated to Smith that "I pushed him," while disputing Smith's claim that Ray

had "punched" another individual. Smith BWC at 2:13:09–10. Smith's observations were sufficient to supply probable cause to arrest Ray regardless of whether Smith had obtained the name of the person he saw Ray strike at that point, and Ray's subsequent statement further bolsters that conclusion.

Ray also argues that Smith ignored countervailing protestations by Ray and others on the scene that Ray was either not fighting or was alternatively trying to break up the fight or act in self-defense of another person. ECF 27 at 5. But "[o]nce a police officer has a reasonable basis for believing there is probable cause," as Smith did here, "he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014); *see Williams v. District of Columbia*, 268 F. Supp. 3d 178, 187 (D.D.C. 2017) ("[O]nce the Officers had probable cause to arrest Williams for assault, they were not required by the Fourth Amendment to interview him to investigate his possible innocence before making an arrest."). And although "the police cannot establish probable cause without at least *some* evidence supporting the elements of a particular offense, including the requisite mental state," *Wesby v. District of Columbia*, 765 F.3d 13, 20 (D.C. Cir. 2014), *rev'd on other grounds by District of Columbia v. Wesby*, 583 U.S. 48 (2018), probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction," *Adams v. Williams*, 407 U.S. 143, 149 (1972). Ray's focus on Smith's failure to conduct additional investigation into the details of the fight before making an arrest— such as speaking to other individuals on the scene who claimed that Ray was not fighting—ignores the fact that Smith himself was a witness to the altercation. *See* July 13 Hr'g Tr. at 58:6–13 ("I know what I witnessed."). Smith's personal observation—corroborated in large part by the body camera footage—of what he believed to be Ray punching another individual during a violent fracas

outside the nightclub provided him sufficient probable cause to arrest. *See Hedgpeth*, 213 F. Supp. 3d at 223. ("No creativity is required to understand how pushing strangers in public—which might also invite them to return the favor—could constitute criminal activity.").

Having probable cause, it was permissible for Smith to place Ray under arrest. The next question is whether he did so. The search-incident-to-arrest exception to the warrant requirement only exists to the extent that an arrest has actually been effected. *United States v. Kelly*, 267 F. Supp. 2d 5, 12 (D.D.C. 2003) ("[A] search cannot be incident to arrest if there is no actual arrest."). To consider whether the seizure is an arrest, as distinguished from an investigative stop, the Court considers factors such as "the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made." *United States v. Williams*, 669 F. Supp. 3d 8, 16 (D.D.C. 2023) (quoting *United States v. White*, 648 F.2d 29, 34 (D.C. Cir. 1981)); *see Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017) (inquiring as to whether the police "undert[ook] even the most basic means of investigation"). To the extent that the Court considers the officers' intent in this analysis, it considers whether the officers' "conduct *objectively* manifests an intent to restrain." *Torres v. Madrid*, 592 U.S. 306, 317 (2021). While review of the videos shows that Smith did not at any point say to Ray that he was 'under arrest,' with those specific words, the overall "impression" of the situation objectively should have conveyed to Ray that "he had been arrested, rather than stopped." *Williams*, 669 F. Supp. 3d at 16–17. After initially struggling to restrain Ray, Smith and King caught up to him and Smith attempted to grab him. Smith BWC at 2:11:10–36. Smith told Ray multiple times that he was "not leaving," and then again restrained Ray, including by grabbing him by the arm and clipping a set of handcuffs onto his left wrist. *Id.* at 2:11:37–57. By that point, Officer Blagrove had arrived and took over the task of handcuffing

Ray. Blagrove BWC at 2:11:54–12:10. Smith testified that by that point, he considered Ray under arrest. July 13 Hr'g Tr. at 20:2–4. And by the time Ray was handcuffed, Smith got on the radio and called for the "wagon," which as he credibly testified, is used to transport arrested individuals to the police station. *Id.* at 19:20–20:4. He also confirmed, in response to an onlooker's question of whether the police were "locking them all up," within earshot of Ray and Blagrove, that "all of them [were] going." Smith BWC at 2:13:37–40. And indeed, the transport van had arrived on the scene next to where Ray and Blagrove were standing before the search of Ray's person began. *Id.* at 2:14:15–22.

Based on the record before it, the Court concludes that Smith had indeed placed Ray under arrest before Blagrove began his search of Ray. *Williams*, 669 F. Supp. 3d at 16–17 (finding that arrest had been accomplished after officer "pursued [defendant] on sight," handcuffed the individual, and "held him by the arms and prevented him from leaving or even moving a few steps"). Viewed objectively, the fact of Ray's arrest would have been apparent not only to Ray and Smith, but also to Blagrove, who was the one who assisted in restraining Ray and subsequently conducted the search which found the firearm. This is the case even though Blagrove's testimony was inconsistent about when he personally considered Ray to be under arrest. In determining the existence of a seizure under the Fourth Amendment analysis, which is grounded in objective reasonableness, "neither the subjective impressions of the defendant nor the subjective intentions of the officer" are determinative of whether "a seizure has occurred," or the nature of that seizure. *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007); *Ohio v. Robinette*, 519 U.S. 33, 38 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Torres*, 592 U.S. at 317. And to the extent that Ray has argued that Blagrove himself needed probable cause to search Ray, despite the fact that Ray was at that point under arrest, an

9

"officer may act on a request to stop and search a suspect made by another officer—or another law enforcement agency—who had probable cause to justify the stop and search." *United States v. Gorham*, 317 F. Supp. 3d 459, 471 (D.D.C. 2018) (citing *United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978)). Smith's actions and statements, as captured on the body camera footage, objectively communicated to all the actors at the scene, including the assisting officer Blagrove, that he had placed Ray under arrest for fighting with others outside the nightclub. *See Hawkins*, 595 F.2d at 752 n.2 (finding that supervisory officer had probable cause to order a search where he "had been in constant radio communication with the officers on the scene, [and] had been given details of the observations of the other officers" which justified the search); *Thompson v. City of Kansas City*, No. 94-3373, 1996 WL 112104, at *5 (10th Cir. Mar. 13, 1996) (finding that an officer assisting another officer "in making an arrest may rely on the arresting officer's probable cause and does not need his own, independent probable cause to arrest"); *cf. United States v. Devaugh*, 422 F. Supp. 3d 104, 113 (D.D.C. 2019) (imputing officer's reasonable suspicion to other officers where "the observing officer, though without necessarily articulating the specific facts or circumstances giving rise to his or her suspicions, reasonably suggests that fellow officers investigate").

Having been placed under arrest by Smith based on probable cause, it was lawful for Smith—or officers acting at his assistance or direction—to perform the search of Ray's person which revealed the firearm. "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Belton*, 453 U.S. at 461; *see also Maryland v. King*, 569 U.S. 435, 449 (2013) (noting that the "constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence" because

10

the "fact of a lawful arrest, standing alone, authorizes a search"). Because the search which revealed the firearm and pills was lawful, the Court finds no grounds to grant Ray's motion to suppress the use of this evidence at trial.

\*    \*    \*

For the foregoing reasons, it is hereby **ORDERED** that Defendant's Motion to Suppress, ECF 27, is **DENIED**.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: July 31, 2026